## HANCOCK *v.* RITCHIE.

Proceeding commenced by process of foreign attachment issued under the statute of 1843. The affidavit was filed and the writ issued in *April*, 1853; but it did not appear that the writ was ever served or returned, nor that it was ever placed in the sheriff's hands. No property was attached, no person garnished, nor were any steps taken to bring the defendant into Court. The record stated that the writ *issued*, and contained a copy of it. Nothing further was done until *December*, 1853, when the defendant appeared and answered.

*Held*, 1. That the statement that the writ *issued* does not imply that it was placed in the hands of the sheriff for service; that the inference is, that it remained in the clerk's office, as he copied it into the record.

2. That the action could not be deemed to have commenced before the delivery of the writ to the sheriff for service; and hence, it was not commenced until *December*, 1853.

3. That the mere making out of a writ, without actual or constructive delivery to the officer for service, was the same as if no writ had issued.

The provisions of the code, touching parties to actions, do not interfere with rights, but affect the remedy only.

Where promissory notes, secured by collaterals, were placed in the hands of an attorney for collection, and he placed them in the hands of others for the same purpose, and afterwards, by a verbal contract, he purchased all the client's interest in the notes, taking a written assignment of the collaterals:—

*Held*, 1. That the verbal contract vested in the attorney an equitable interest in the notes, and no other assignment or delivery of them was necessary.

2. That under the code, suit upon the notes should be brought in the name of the purchaser, he being the real party in interest.

APPEAL from the *Jefferson* Circuit Court.

WORDEN, J.— This was an action by the appellant against *William G. Ritchie* and *Joseph E. Southwick*, upon two promissory notes. The case was dismissed by agreement of parties as to *Southwick*, with an agreement

that the notes shall be considered and treated as if they were joint and several. The suit was commenced by foreign attachment under the law of 1843. The notes were made by *Southwick* and *Ritchie*, payable to *Hancock* and *Wheeler*, one dated *July* 27, 1839, for 357 dollars, and the other dated *June* 21, 1840, for 415 dollars, 22 cents. Several credits appeared upon the notes.

The defendant, *Ritchie*, appeared and set up for defense 1. That *Hancock* and *Wheeler*, before the commencement of the suit, sold, transferred, and delivered the notes to *Michael G. Bright*, for a valuable consideration, and that the plaintiff had no interest in them nor claim upon them against the defendant. 2. Payment by defendant to *Hancock* and *Wheeler*.

There were other matters set up for defense, but it is unnecessary to notice them in this opinion.

Replications were filed in denial of the above paragraphs of the answer.

Trial by the Court; finding for defendant; and judgment on the finding, over a motion for a new trial.

It appears, by a bill of exceptions, that the Court found that there was due and owing on the notes, by defendant, the sum of 381 dollars, 18 cents; but found for the defendant on the ground that the plaintiff had assigned his interest in the notes to *Bright*, and was not the owner or holder thereof when the suit was brought.

The facts in the case are substantially as follows:

In the month of *June*, 1840, the notes in suit were placed in the hands of *Michael G. Bright* and his partner, *Pitcher*, as attorneys, for collection, together with two other notes between the same parties. The notes were indorsed in blank at that time by *Hancock* and *Wheeler*. At the same time there were collaterals placed in the hands of *Bright* and *Pitcher*, from defendants, indorsed to *Hancock* and *Wheeler*, to an amount exceeding the aggregate of the four notes left with *Bright* and *Pitcher*. Suit was not to be brought on the notes against defendants until instructions should be given to do so; but the collaterals were to be collected, and the proceeds applied to the payment of the four

notes, each party to pay one-half the exchange and fees. They made collections on the collaterals from time to time, and remitted the proceeds to *Hancock* and *Wheeler*, during the life of *Wheeler*, and, after his death, to *Hancock* alone. Afterwards *Bright* and *Pitcher* dissolved their partnership, and *Bright* became associated with *William M. Dunn* in the practice of law, taking into the new firm the business of the old partnership. Some time after this the partnership of *Bright* and *Dunn* was dissolved, and *Dunn* became associated with *A. W. Hendricks*, and retained in his possession and charge the old business, and all papers connected with the partnership of *Bright* and *Dunn*, and, among the rest, the four notes named. The notes sued on remained in the possession of *Dunn* and *Hendricks*, and on the 6th of *September*, 1851, *Hancock* called and took their receipt for and gave directions concerning them. In *December*, 1849, *Wheeler* in the meantime having died, *Bright* purchased from *Hancock* all the balance of his interest in the unpaid claims against the defendants. This is as he, *Bright*, understood it. At that time there remained a balance uncollected on the collaterals, of over 600 dollars, and he purchased that balance, together with some other claims against other parties, for 825 dollars, which he then paid *Hancock*. On the collaterals, judgments had been rendered in favor of *Hancock* and *Wheeler*, (with the exception of one small note,) which judgments were assigned by *Hancock* to *Bright*, all of which have since been collected, with the exception of one rendered against *William Coppuck*, in *February*, 1842, for 284 dollars, 18 cents. Had all the collaterals been collected, it would just about have discharged the notes of *Hancock* and *Wheeler*, together with expenses; but in consequence of the failure to collect the judgment for 284 dollars, 18 cents, there was a balance due, with interest, amounting to the sum found by the Court. *Coppuck* is, and has been since the claim was left with *Bright* and *Pitcher*, utterly insolvent, and nothing has been made on the judgment. The notes sued on were in the possession of *Dunn* and *Hendricks* at the time the suit was brought, and were never assigned or delivered to *Bright*

by *Hancock*, otherwise than as before stated. Mr. *Bright* was not apprized of the bringing of the suit until after it was commenced, but when he was advised of it, approved the proceeding. It was also proven that in *December*, 1849, the plaintiff, in a conversation with witness, in reference to his claim against the defendants, said that he had got his money; that he was satisfied; that Mr. *M. G. Bright* had paid it to him. Perhaps it should be observed, that the assignment of the judgments on the collaterals, including the judgment against *Coppuck*, was without recourse in law or equity.

On the trial, the plaintiff's attorney filled up the blank indorsement of *Hancock* and *Wheeler* with an assignment to *Hancock*.

Could the suit, on the foregoing facts, be maintained on the notes, in the name of *Hancock* as plaintiff?

In order to determine this question, it is necessary to ascertain at what time the suit was commenced, and whether the proceedings are to be governed by the code of 1843, or that of 1852. The proceedings were commenced by process of foreign attachment, issued under the provisions of the law of 1843. The affidavit was filed and the writ issued on the 15th day of *April*, 1853. But it does not appear that the writ was ever served or returned by the sheriff, nor that it was ever placed in his hands, or in any manner delivered to him. No property was attached or person summoned as garnishee, nor do any steps appear to have been taken to bring the defendants into Court, by notice or otherwise. The record states that the writ *issued*, and it is copied into the record. Nothing further appears to have been done until the 26th day of *September*, 1853, when the defendants appeared and answered.

Was the suit commenced on the 15th of *April*, 1853, or not until the appearance of defendant in *September* afterwards?

The statement in the record that the writ *issued*, does not, we think, imply that it was placed in the hands of the sheriff for service. It might have been delivered by the clerk to the plaintiff or his attorneys; but the inference is,

that it remained in the clerk's office, as he copies it into the record. We are of opinion that a delivery of the writ to the sheriff for service, or something equivalent to such delivery, was necessary, in order that the action might be deemed to have been commenced.

In the case of *Carpenter* v. *Butterfield*, 3 Johns. Cas. 146, the writ had been issued and placed in the hands of the officer, who went to arrest the defendant; but the defendant avoided the arrest until he procured the assignment of a note, for the purpose of setting it up as an offset to the plaintiff's claim. *Held*, that the suit was commenced before the note was assigned. This case is made the basis of what is said in reference to this matter, in *Clark* v. *Redman*, 1 Blackf. 379. In this last case, the point was not whether the writ must be delivered to the officer, but whether the filing of a declaration was the commencement of the suit; and the Court say that, "in *New York* it has been decided, that the impetration of the writ, as to every material purpose, is the commencement of the action"—citing the case of *Carpenter* v. *Butterfield, supra.*

In *Bronson* v. *Earl*, 17 Johns. 63, it was said by the Court, that "the suing out of the writ has been held, in several cases, by this Court, to be the commencement of the suit; and although there may be some uncertainty or ambiguity in the term 'suing out the writ,' yet there can be no doubt that the delivery of the writ to the proper officer, or leaving it at his house, as in this case, for the purpose of being executed, is to be deemed the actual commencement of the suit." In *Ross* v. *Luther*, 4 Cow. 188, it was also held, that the suit could not be considered as having been commenced until the actual delivery of the writ to the officer, and in *Underwood* v. *Tatham*, 1 Ind. R. 276, which was an action of replevin, where a demand was necessary before bringing suit, and none was made until the writ had been delivered to the officer, it was held that the issuing of the writ *to the sheriff*, (thereby implying its delivery,) was the commencement of the suit.

These authorities, we think, settle the question. As the writ was not delivered to the sheriff for service, we do not

determine whether, if it had been delivered, in a case like
the present, where it was not served, no property being at-
tached and no one summoned as garnishee, and the defend-
ant not notified, the suit would be considered commenced,
until the appearance of the defendant.

The mere making out of a writ, without a delivery to
the officer for service, either actual or constructive, we think,
leaves the case, so far as this question is concerned, as if
no writ had been issued, and the case falls within the prin-
ciple determined in the case of *The State* v. *Clark*, 7 Ind.
R. 468.

We are of opinion that the suit cannot be considered to
have been commenced until the appearance of defendant
in *September*, 1853, and that, therefore, the provisions of
the code of 1852 are applicable to the proceedings—that
code having taken effect *May* 6, 1853.

But it is objected that the code of 1852 did not, and
could not, take away a vested right of action; that under
the old law, the plaintiff had a vested right of action which
is not taken away. It is provided by 1 R. S. p. 431, § 2,
that " no rights vested, or suits instituted under existing
laws, shall be affected by the repeal thereof, but all such
rights may be asserted, and such suits prosecuted, as if such
laws had not been repealed."

We have already seen that the suit was not instituted
or commenced until after the code of 1852 took effect. The
provisions of the code in reference to parties to actions, we
think, do not interfere with the rights themselves, but, like
limitation laws, merely affect the remedy. They point out
in what manner rights shall be asserted. They determine
in whose name, and against whom, suits shall be brought
to enforce the rights of the parties. That this may be
done, is settled in the case of *Graham et al.* v. *The State*,
7 Ind. R. 470.

The action, being governed by the code of 1852, must
be brought in the name of "the real party in interest." 2
R. S. p. 27. We are of opinion that the evidence in the
case shows that *Bright* was the real party in interest, and
therefore, that the suit should have been brought in his

name. The evidence is, that in 1849 he purchased of *Hancock* all the balance of his interest in the unpaid claims against the defendants, as he understood it. There is nothing in the record to show that he misunderstood it. On the contrary the statements of the plaintiff go to corroborate the correctness of this understanding. He said, in speaking of these claims, that he had got his money; that Mr. *Bright* had paid it to him. It is suggested that Mr. *Bright* meant merely, that as he had bought and taken an assignment of the collaterals, one of which proved to be worthless, he would have an equitable interest in the notes to that amount, as he understood it. But we do not so understand the testimony. The collaterals were against third parties, and in addition to purchasing them, he says he purchased the balance of *Hancock's* claim against the defendants. This we understand to have been a verbal contract, as the written assignment only embraced the claims against third persons on the collaterals. No other assignment or delivery was necessary to vest in *Bright* an equitable interest in the notes than the contract above mentioned. They had already been delivered to Mr. *Bright* for collection, and, as between him and *Hancock*, might still be considered in his possession. Although the notes had actually passed into the hands of other attorneys for collection, yet the relations of *Hancock* and *Bright* had not changed at the time of the contract in question, so that if any delivery were necessary to vest the equitable title to the notes in *Bright*, that delivery had already taken place. *Bright* would have been responsible to *Hancock* for the money, had it been collected by those into whose hands the notes passed. *Pollard* v. *Rowland*, 2 Blackf. 22. It might with much plausibility be contended that, as the notes were indorsed in blank by the payees at the time they were delivered to *Bright* and *Pitcher* for collection, and as *Bright* afterwards bought them, having them already in his possession he would have the right to fill up the indorsements with an assignment to himself. It does not appear clearly whether, at the time of Mr. *Bright's* purchase, the notes had passed to his successors in business or not, but if they

had, their possession would be deemed his, as it was not <span>Nov. Term, 1858.</span>
until 1851, that *Hancock* called on Messrs. *Dunn* and *Hendricks*, and gave directions concerning the notes and took
*their* receipt for the same.    But we do not choose to place
the case upon the ground that Mr. *Bright* was the legal
holder of the notes, as we think that at least an equitable
interest passed to him, which made him the real party in
interest, and justified the finding of the Court below.

<span>THE MADISON, &c., RAILRO'D Co. v. WHITESEL.</span>

*Per Curiam.*—The judgment is affirmed with costs.

*H. W. Harrington*, for the appellant.

*J. Sullivan*, for the appellee.